CLERK'S OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED
4/13/2020
JULIA C. DUDLEY, CLERK
BY: s/ A. Little
DEPUTY CLERK

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF VIRGINIA
### LYNCHBURG DIVISION

| | |
|---|---|
| CHRISTINE M. OWEN, | Case No. 6:19-cv-00007 |
| *Plaintiff,* | |
| v. | <u>MEMORANDUM OPINION</u> |
| LIBERTY UNIVERSITY, *et al.*, | |
| *Defendants.* | Judge Norman K. Moon |

      This action is before the Court on Defendants Liberty University, Nicole M. Dilella, Mary Deacon, Denise Daniel, Elias Moitinho, and Eric Camden's motion to dismiss Plaintiff Christine M. Owen's complaint, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, Dkt. 13, Plaintiff's motion for summary judgment, Dkt. 17, Liberty University's motion to stay Plaintiff's motion for summary judgment, Dkt. 25, Defendants' motion to strike Plaintiff's surreply, Dkt. 29, and Plaintiff's motion for leave to file her surreply, Dkt. 32.

      In her sprawling, 109-page complaint, Plaintiff alleges twenty-nine counts against the Defendants. Plaintiff raises claims for violation of Title IX of the Education Amendments Act of 1972 ("Title IX"); conspiracy to injure another in their reputation, trade, business or profession, pursuant to Va. Code § 18.2-499; and state common law claims for breach of contract, breach of the covenant of good faith and fair dealing, negligence, defamation, defamation per se, negligent infliction of emotional distress, and intentional infliction of emotional address. Many of Plaintiff's arguments are frivolous or border on frivolity.

      As explained below, the Court will grant Defendants' motion to dismiss, Dkt. 13. As such, the Court will deny as moot Plaintiff's motion for summary judgment, Dkt. 17, Liberty

University's motion to stay Plaintiff's motion for summary judgment, Dkt. 25, and Plaintiff's pending motion to compel discovery responses and production, Dkt. 46. The Court will deny Plaintiff's motion for leave to file her surreply, Dkt. 32, and grant Defendants motion to strike it, Dkt. 29.

## I. ALLEGED FACTUAL BACKGROUND

Given the nature of Plaintiff's 109-page complaint, complete with an additional 169 pages of exhibits, the Court will briefly outline the factual allegations that make up Plaintiff's twenty-nine counts. Additional factual details from the complaint will be added throughout the analysis section as necessary.

Plaintiff was a doctoral candidate in Defendant Liberty University's ("Liberty") Counseling Education & Supervision ("CES") program until her "de facto" dismissal, which occurred when a department remediation proceeding found her unfit to continue in that program and required Plaintiff to undertake a series of steps to re-enter the program—steps which Plaintiff found severely unreasonable. *See* Dkt. 4 at ¶ 23; Dkt. 4-1, Ex. B. In response, she has sued Liberty, four Liberty faculty within the academic department, and a former classmate based on conduct related to the remediation proceeding and the events leading to the incident reports on which that proceeding was based.

The conduct underlying this dispute began in November 2017, when Defendant Mary Deacon, a Liberty faculty member, emailed Plaintiff with concerns about the accuracy of information Plaintiff had posted in a private Facebook group for alumni of Liberty's master's program in professional counseling.[1] *See* Dkt. 4 at ¶¶ 92–102; Dkt. 4-1, Exs. F–G. The information

---

[1] The complaint makes clear that the group was not run by Liberty. Despite this, some faculty members, including Deacon, were members of this group for at least some amount of time. *See, e.g.*, Dkt. 4 at ¶ 88.

Plaintiff circulated related to, among other things, the accreditation status of the program. Dkt. 4-1, Exs. F–G. Deacon filed this email with Dr. Lisa Sosin, the PhD Program Director, as an incident report against the Plaintiff. *Id*.

"Unbeknownst" to Plaintiff, "two other professors also purportedly filed incident reports complaining of [Plaintiff's] alleged misconduct in prior classes." Dkt. 4 at ¶ 15. The incident reports were largely based on faculty members' concerns about Plaintiff's interpersonal skills and professional competence. *Id*. at ¶¶ 39–40. The first professor to do so, Defendant Denise Daniel, filed an incident report in November 2017 relaying concerns about Plaintiff's class performance—in particular, she related Plaintiff's inability to accept feedback from others. Dkt. 4-1, Ex. O; *see* Dkt. 4 at ¶¶ 144–151. Another of Plaintiff's professors, Defendant Nicole Dilella, filed two incident reports against Plaintiff. The first was in December 2017 and related to Plaintiff's behavior in disputing a grade in Dilella's course. Dkt. 4-2, Ex. Q; *see* Dkt. 4 at ¶¶ 154–63. In June 2018, Dilella filed a second incident report, which related to Plaintiff's conduct during a June 2018 class presentation that Plaintiff gave in a course Dilella taught; the presentation related to the diagnosis and treatment plan she had provided to a client. This second incident report noted Plaintiff's inability to receive feedback and her overly "defensive" nature in the face of feedback. Dkt. 4-2, Ex. R; *see* Dkt. 4 at ¶¶ 164–94. During the June 2018 presentation, Defendant Eric Camden is alleged to have challenged Plaintiff's diagnosis and treatment protocol, suggesting alternative diagnoses and treatment protocols. *See, e.g.*, Dkt. 4 at ¶ 282. Dilella supported Camden's comments, and she joined in asking Plaintiff why she did not make such considerations. *Id*. Plaintiff claims that Dilella and Camden violated the American Counseling Association's ("ACA") Code of Ethics just by questioning her diagnosis and suggesting a treatment protocol that, in her view, was not "relevant to the client's presenting issues." *Id*. at ¶ 279. Dilella's second

incident report also conveyed concerns about equine therapy services that Plaintiff had previously offered to children in an unsupervised environment at her home in Georgia as part of a nonprofit ministry she ran with her husband. Dkt. 4-2, Ex. R; *see* Dkt. 4 at ¶¶ 164–94. Defendant Camden allegedly brought to Dilella's attention Plaintiff's provision of equine therapy services when he relayed his concerns about Plaintiff's "harmful" counseling practices. *Id*. at ¶ 450.

After a "closed-door" discussion by Liberty's Remediation Committee, *id.* at ¶ 28, Liberty "immediately placed [Plaintiff] on emergency suspension," halting Plaintiff's practicum, administratively dropping Plaintiff's scheduled Fall course, and barring Plaintiff from registering for any academic course in the Spring 2019 semester, *id*. at ¶ 23. Plaintiff appealed the Remediation Committee's decision three times, apparently receiving a second remediation proceeding based on procedural deficiencies in the first remediation proceeding. *See id*. at ¶¶ 208–15. Defendant Elias Moitinho, who oversaw her initial appeal, sat as a member of her second remediation proceeding. *Id*. at ¶ 216. As a member of that second proceeding, he added two additional concerns to Plaintiff's file, which were based on his interactions with her during the first appeal process. *See id*.

Plaintiff states that she did not learn about the concerns documented in the incident reports until after Liberty's Remediation Committee had "rendered judgment against" her. *Id*. at ¶ 17. As Plaintiff repeatedly emphasizes in her complaint, she requested that Liberty provide to her any and all disciplinary records in her file, but none existed. *See, e.g*., *id*. at ¶ 73; Dkt. 4-1, Ex. C. Because she was not aware of the existence or content of the incident reports, she "never had the opportunity to confront her accusers, read their full statements" or review evidence relating to her alleged infractions. Dkt. 4 at ¶ 33. Plaintiff further claims that the information contained in the June 2018 incident report contained "egregious misrepresentations and selective facts to effect [Plaintiff's]

suspension." *Id*. at ¶ 42. According to Plaintiff's complaint, this behavior, along with email correspondence, the prejudicial make-up of the remediation committee members, and the excessively severe punishment she received, form the basis for her claim that Defendants had an "agenda to oust" Plaintiff, which she argues is an unlawful conspiracy. *Id*. at ¶¶ 16, 42–44, 48. Further, the implementation of Liberty's remediation process, she contends, "favored [Plaintiff's] male classmate [Defendant] Camden's unsupported version of events." *Id*. at ¶ 56 (emphasis in original). Plaintiff also claims that Defendants made oral or written statements regarding her situation to disinterested third parties, as evidenced by a public Facebook post about the events by a student who "was not involved in [Plaintiff's] matter at all and would only know about it from" Defendants. *Id*. at ¶ 59.

Plaintiff filed this action on February 21, 2019, seeking $70 million in damages for Defendants' harm to her "physical well-being, mental and emotional well-being, reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorney's fees, expenses, costs, and disbursements." *Id*. at ¶¶ 106–09. Defendants filed their motion to dismiss the complaint on March 29, 2019, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Dkt. 13. Plaintiff filed a motion for summary judgment on Counts II and III on April 12, 2019. Dkt. 17. Defendants' motion to dismiss is now fully briefed and ripe for disposition.

## II. PLAINTIFF'S SURREPLY

The Local Rules for the Western District of Virginia state,

> "Unless otherwise directed by the Court, the opposing party must file a responsive brief and such supporting documents as are appropriate within 14 days after service [of a motion], and the moving party may file a rebuttal brief within 7 days after the service of the opposing party's reply brief. No further briefs (including letter briefs) are to be submitted without first obtaining leave of court.

W.D. Va. Local Rule 11(c)(1) (emphasis supplied). Without leave from this Court, Plaintiff submitted a surreply opposing Defendants' motion to dismiss, Dkt. 22, and she now asks this Court to deny Defendants' motion to strike her surreply from the record, Dkt. 29, and grant her leave to file it, Dkt. 32. The Court refuses. Defendants did not introduce any new arguments in their rebuttal brief in support of their motion to dismiss, Dkt. 19, and—as is natural, given this stage in the litigation—no new evidence has entered the case that would merit granting leave to file a surreply. *Cf. Courtney-Pope v. Bd. of Educ. of Carroll Cty.*, 304 F. Supp. 3d 480, 485 (D. Md. Jan. 19, 2018). Plaintiff has already taken the opportunity throughout her complaint to make lengthy legal arguments in support of her claims, and as already emphasized, her complaint spans over one-hundred pages. *See* Fed. R. Civ. P. 8(a)(2) (stating that a pleading that states a claim for relief must contain "a short and plain statement of the claim showing that the pleader is entitled to relief" (emphasis supplied)). Further, Plaintiff has had ample opportunity to defend against the Defendants' motion to dismiss in her forty-one-page opposition memorandum, Dkt. 16-1. Accordingly, the Court does not see fit to grant Plaintiff leave to file her surreply. The Defendants' motion to strike it from the record, Dkt. 29, will be granted and Plaintiff's request for leave, Dkt. 32, will be denied.

### III.  MOTION TO DISMISS: STANDARD OF REVIEW

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) tests the legal sufficiency of a complaint to determine whether a plaintiff has properly stated a claim. The complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), with all allegations in the complaint taken as true and all reasonable inferences drawn in the plaintiff's favor, *King v. Rubenstein*, 825 F.3d 206, 212

(4th Cir. 2016). A motion to dismiss "does not, however, resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Id*. at 214.

Although the complaint "does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. A court need not "accept the legal conclusions drawn from the facts" or "accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Simmons v. United Mortg. & Loan Inv.*, LLC, 634 F.3d 754, 768 (4th Cir. 2011) (internal quotations omitted). This is not to say Rule 12(b)(6) requires "heightened fact pleading of specifics," instead the plaintiff must plead "only enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Still, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

## IV.   MOTION TO DISMISS: ANALYSIS
### A.  Title IX: Count I

Title IX prohibits any school which receives federal funds from discriminating on the basis of sex. 20 U.S.C. § 1681. A student discriminated against on this basis may seek damages for injuries sustained as a result of a Title IX violation. *See Cannon v. Univ. of Chicago*, 441 U.S. 677, 688–89 (1979) (finding an implied right of action under Title IX). When a student challenges the outcome of a school disciplinary proceeding under Title IX, courts have generally followed the framework developed in *Yusuf v. Vassar Coll*., 35 F.3d 709 (2d Cir. 1994). In *Yusuf*, the Second Circuit looked to the body of law surrounding Title VI of the Civil Rights Act of 1964, which prohibits race discrimination in all programs receiving federal funds, and it articulated two theories of Title IX liability: "erroneous outcome" and "selective enforcement." *Id*. at 714–15; *see also Cannon*, 441 U.S. at 704 (explaining that Title IX was modeled after Title VI, as both "sought to

accomplish two related, but nevertheless somewhat different, objectives."). Plaintiff pleads under both the erroneous outcome theory and the selective enforcement theory, but she fails to state a claim for relief under Title IX because she fails to plead more than conclusory or speculative allegations of gender bias.

The erroneous outcome standard applies when a plaintiff claims that a university disciplinary proceeding wrongly found her responsible for an offense. *Yusuf*, 35 F.3d at 715. A plaintiff seeking relief under this standard must allege facts which establish a causal link between the erroneous outcome and gender bias. *Id*.; *see also Sahm v. Miami Univ*., No. 1:14-cv-698, 2015 WL 93631, at *5 (S.D. Oh. Jan. 7, 2015) ("A plaintiff bringing an erroneous outcome claim must plead two elements: (1) facts sufficient to cast doubt as to the accuracy of the outcome of the disciplinary proceeding and (2) causation [by gender bias]."). "Allegations of a procedurally or otherwise flawed proceeding that has led to an adverse and erroneous outcome combined with a conclusory allegation of gender discrimination is not sufficient to survive a motion to dismiss." *Yusuf*, 35 F.3d at 715. Rather, a plaintiff must "allege particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding." *Id*. For example, a plaintiff might point to the existence of "statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender," or "statements reflecting bias by members of the tribunal." *Id*.

Even assuming that the remediation proceedings are disciplinary proceedings, Plaintiff has not alleged a single statement from any member of the committee that could possibly be construed as gender bias. Further, as evidence of a "pattern" of gender-biased remediation proceedings, Plaintiff merely compares the male-to-female ratio of those who enrolled in the CES program to that of the graduating class. The allegations demonstrate that between the four students who

graduated from the program in 2016 and the six who graduated from the program in 2018, men steadily made an up an increased percentage of the graduating class as compared with the ratio at enrollment. Plaintiff makes the incredible inferential leap that "Liberty's CES is systematically reducing the number of female students through improper 'remediation' procedures (such as in [Plaintiff's] case) that may be covertly grounded in gender discrimination against females, while the number of male students remains unaffected and thus ends up reflecting a higher ratio in upper-level classes and graduation." *Id*. at ¶ 299. Even when making all reasonable inferences in favor of the Plaintiff, as required at the motion-to-dismiss stage, Plaintiff relies on mere speculation to make her claim. Indeed, there are no non-conclusory allegations in her complaint that provide any factual basis to support the gender bias aspect of her erroneous outcome theory. Rather, her complaint fails to state a claim on this basis, because it at most includes "allegations of a procedurally or otherwise flawed proceeding that has led to an adverse and erroneous outcome combined with a conclusory allegation of gender discrimination." *Yusuf*, 35 F.3d at 715.

Under a selective enforcement theory, a plaintiff can argue that the "severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender." *Yusuf*, 35 F.3d at 715. "To successfully state a claim of selective enforcement, a plaintiff must plausibly allege that the university treated the plaintiff less favorably than a similarly situated student of the opposite gender and that the plaintiff's gender was a motivating factor for the less favorable treatment." *Sheppard v. Visitors of Va. State Univ*., No. 3:18-cv-723, 2019 WL 1869856, at *4 (W.D. Va. Apr. 25, 2019). As with claims based on an erroneous outcome theory, selective enforcement claims cannot survive a motion to dismiss pursuant to Rule 12(b)(6) where the allegations of gender discrimination are "wholly conclusory." *See Yusuf*, 35 F.2d at 715.

The Fourth Circuit has not addressed whether claims under a selective enforcement theory require a plaintiff to allege a similarly situated comparator in order to properly plead less favorable treatment, but courts in the Western and Eastern Districts of Virginia both have reasoned that there is such a requirement. *Doe 2 v. Fairfax Cty. Sch. Bd.*, 384 F. Supp. 3d 598, 608–09 (E.D. Va. 2019); *Streno v. Shenandoah Univ.*, 278 F. Supp. 3d 924, 931–32 (W.D. Va. 2017). To be considered similarly situated, the plaintiff must point to another student who has engaged in the same conduct "without such differentiating or mitigating circumstances that would distinguish their conduct or the school's treatment of it." *Saravanan v. Drexel Univ.*, No. 17-3409, 2017 WL 5659821, at *6 (E.D. Pa. Nov. 24, 2017); *see Sheppard*, 2019 WL 1869856, at *5.

Plaintiff pleads that Liberty selectively enforced its alleged policies 1) requiring students to adhere to the American Counseling Association ("ACA") Code of Ethics, 2) prohibiting self-plagiarism, and 3) permitting "the first student presenting during Practicum to be granted an extra week to complete the written assignments related to that first presentation." Dkt. 4 at ¶¶ 279–86. All three of these arguments fail because Plaintiff's allegations of gender discrimination are wholly conclusory and because Plaintiff has failed to allege a similarly situated comparator. *See Xiaolu Peter Yu v. Vassar Coll.*, 97 F. Supp. 3d 448, 480 (S.D.N.Y. 2015); *Doe v. Univ. of the South*, 687 F. Supp. 2d 744, 757 (E.D. Tenn. 2009) (dismissing claim where plaintiff "failed to plead facts or provide the Court with any evidence that the University's actions against John Doe were motivated by his gender and that a similarly situated woman would not have been subjected" to the same enforcement).

Plaintiff provides no factual allegations of circumstances that could lead to any reasonable inference that her gender was a motivating factor in the enforcement of any of Liberty's policies. As with her erroneous outcome claim, Plaintiff has not alleged a single gender-biased statement

or any pattern of gender discrimination that might have added color to her claims of gender bias. *See Yusuf*, 35 F.3d at 715. Rather, her gender-bias allegations are completely conclusory. This is especially remarkable given the voluminous nature of the complaint, including the vast amount of email correspondence she attached to it.

Her comparator allegations fare no better. Plaintiff alleges that Camden, a male classmate of hers, engaged in violations of the ACA Code of Ethics simply by suggesting to Plaintiff during her June 2018 class presentation that she should have considered alternative diagnoses and treatment protocols in treating the client she had featured in her presentation. Plaintiff contends that Camden's suggested diagnoses and treatment protocols were so inappropriately suited to the circumstances that his mere suggestions rose to the level of "wrong[ful] and unethical[]" conduct. Dkt. 4 at ¶ 171. She further contends that Dilella, as the professor overseeing the class, endorsed Camden's challenge to Plaintiff's treatment approach. Despite this alleged violation of the ACA Code of Ethics, Plaintiff highlights that Liberty only investigated her for ACA ethical violations, which related at least in part to her unsupervised provision of equine therapy services to children at her home in Georgia.

Plaintiff essentially argues that Liberty selectively enforced the ACA Code of Ethics when it decided to investigate her through its remediation proceedings but failed to investigate Camden for his allegedly violative conduct. Plaintiff's claim fails because Camden is simply not a similarly situated comparator. Plaintiff attempts to make her claim at too high a level of generality—ACA ethical violations, generally. *Sheppard*, 2019 WL 6039953, at *2 (finding that in order for a student to serve as a similarly situated comparator she must be accused of the same charge). Even assuming that Camden's conduct did violate the ACA Code of Ethics—and to be clear, the Court is not suggesting that would be the case if the Court considered the issue on its merits—he and Plaintiff

did not engage in anything remotely approaching the same conduct. Plaintiff's alleged violations included her unsupervised provision of equine therapy services to children, while Camden is alleged to have engaged in a mere academic debate with the Plaintiff in a class setting. Further, the allegations detailing the incident reports and remediation proceedings that followed them do not even give the slightest hint that gender bias was at play in the enforcement of the ACA Code of Ethics.

The same is true of Plaintiff's other selective enforcement claims. Plaintiff alleges that her Practicum supervisor, a male graduate of Liberty's CES program, "advised that he was permitted to use overlapping clinical language in his own case conceptualization papers throughout his degree without ever having been accused of plagiarism." Dkt. 4 at ¶ 285. But given that he is a graduate of the program and her supervisor, she necessarily alleges that the two of them self-plagiarized at completely different times. To be considered similarly situated, the plaintiff must point to another student who has engaged in the same conduct "without such differentiating or mitigating circumstances that would distinguish their conduct or the school's treatment of it." *Saravanan*, 2017 WL 5659821, at *6; *see Sheppard*, 2019 WL 1869856, at *5. While Plaintiff does allege that she and a male (former) student engaged in the same conduct, it is not at all clear that they were similarly situated to one another, given the gap in time between their conduct. But even if Plaintiff's failure to point to a comparator who engaged in self-plagiarism at a similar time does not lead to her claim's dismissal, her failure to plead any sufficient factual allegations of gender bias in the self-plagiarism policy's enforcement does.

Similarly, Plaintiff merely alleges that she "was treated differently than a third male student, who advised [her] in writing that it was standard and customary Liberty policy for the first student presenting during Practicum to be granted an extra week to completed the written

assignments related to that first presentation." *Id*. at ¶ 286. Even if one were to accept that enforcement of such selective enforcement of such a policy would constitute a violation of Title IX, Plaintiff has merely alleged that a male student told her that the policy existed. She does not allege that a male student received more favorable treatment in the administration of this policy than she, as a female student, did. And, as with her other claims, she has not at all alleged that the selective enforcement of this policy was motivated by gender bias.

As Plaintiff has failed to plead sufficient factual allegations to state a Title IX claim under either an erroneous outcome theory or a selective enforcement theory, the Court will dismiss Count I.

**B. Contractual Claims: Counts II–III**

Plaintiff brings two contract-related claims against Liberty under Counts II and III. The first is for breach of contract, and the second is for violation of the covenant of good faith and fair dealing. Under Virginia law, a plaintiff claiming breach of an express contract must establish (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by a breach of obligation. *Riley v. Barringer*, 337 F. Supp. 3d 647, 654 (W.D. Va. 2018) (Jones, J.) (citing *Ulloa v. QSP, Inc*., 624 S.E.2d 43, 48 (Va. 2006)). In order to state a claim for violation of the covenant of good faith and fair dealing under Virginia law, the Plaintiff must allege (1) a contractual relationship between the parties, and (2) a breach of the implied covenant. *Charles E. Brauer Co., Inc. v. NationsBank of Va., N.A.*, 466 S.E.2d 382, 386 (Va. 1996). Because Plaintiff has not alleged the existence of a contractual relationship, her claims under Count II and III will be dismissed.

Plaintiff claims that "a contractual relationship exists between Liberty and [Plaintiff] through Liberty's 2017–2018 PhD CES Handbook ("CES Handbook") [and] Liberty's 2017–2018

Honor Code." Dkt. 4 at ¶ 309. Plaintiff goes on to argue that, while this Court has previously held that similar documents do not create an enforceable contract between a university and its students, this case is distinguishable because Liberty had contracted for accreditation with the Council for Accreditation of Counseling and Related Programs ("CACREP"). She alleges that CACREP "requires that Liberty strictly abide by Liberty's own written policies and the code of ethics of the American Counseling Association ("ACA")," *Id*. at ¶ 200. In relevant part, Plaintiff points to Section 1.O of CACREP's standards, which reads, "Counselor education programs have and follow a policy for student retention, remediation, and dismissal from the program consistent with institutional due process policies and with the counseling profession's ethical codes and standards of practice." Plaintiff argues that she is a third-party beneficiary to Liberty's accreditation agreement with CACREP and thus has standing to enforce it. She alleges that Liberty breached its accreditation agreement when it failed to follow its remediation policies in her remediation proceedings. The Court will first address whether the CES Handbook and Liberty Honor Code create a contractual relationship between Liberty and the Plaintiff. It will then address Plaintiff's third-party-beneficiary theory based on the CACREP accreditation agreement.

This Court and numerous others have held that generally applicable university conduct policies, such as handbooks, do not establish a contract under Virginia law. *See, e.g.*, *Jackson v. Liberty Univ.*, No. 6:17-cv-00041, 2017 WL 3326972, at *6 (W.D. Va. Aug. 3, 2017). That is because Virginia law requires an "absolute mutuality of engagement between the parties" such that each party is bound and may hold the other party to the agreement. *Jackson*, 2017 WL 3326972, at *5 (citing *Smokeless Fuel Co. v. W.E. Season & Sons*, 52 S.E. 829, 830 (Va. 1906)) ("The general rule of law is that, where the consideration for the promise of one party is the promise of the other party, there must be absolute mutuality of engagement, so that each party has the right

to hold the other to a positive agreement."). This mutuality is absent in university student-conduct policies, as these policies allow for unilateral revision by the university and do not bind the school. *See, e.g.*, *Doe v. Marymount Univ.*, 297 F. Supp. 3d 573, 588 (E.D. Va. 2018) ("Under Virginia law, a University's student conduct policies are not binding, enforceable contracts; rather, they are behavior guidelines that may be unilaterally revised by Marymount at any time. Thus, Doe cannot rely on Marymount's Student Handbook or Sexual Assault policy as enforceable contracts, or as terms of an implied contract."); *Doe v. Washington & Lee Univ.*, No. 6:14-cv-00052, 2015 WL 4647996, at *11 (W.D. Va. Aug. 5, 2015) (explaining that "[c]ourts applying Virginia law routinely reject the notion that a 'Student Handbook' creates a mutuality of engagement where the terms of the handbook are subject to change"); *Davis v. George Mason Univ.*, 395 F. Supp. 2d 331, 337 (E.D. Va. 2005) (finding university course catalog to be an unenforceable illusory contract because of the catalog's disclaimer that it may change its terms or requirements at any time). Without an underlying contract, there can be no breach of contract or breach of good faith. *Jackson*, 2017 WL 3326972, at *7.[2]

There is no meaningful distinction between the handbooks and honor code that Plaintiff cites in her complaint and those in the above-referenced cases. Indeed, the honor code at issue in

---

[2] Plaintiff seems to acknowledge much of this case law, as her briefing on this motion to dismiss includes bold declarations such as the following: "The foundation of this case reveals the ugly undergirding by private universities of students' rights under the mask of antiquated case law. It is high time for new case law to eradicate such bold abuses of power . . . ." Dkt. 16-1 at 20. If that is what Plaintiff has come to this Court seeking, she has come to the wrong place—at least with regard to her state law claims. As a federal court sitting in diversity, this Court cannot simply discard "antiquated" Virginia case law. *Broussard v. Meineke Disc. Muffler Shops, Inc.* 155 F.3d 331, 348 (4th Cir. 1998). Instead, it must faithfully apply Virginia law as Virginia courts have applied it. *See id.* It is for Virginia state courts to decide what Virginia law is, and it is the role of the Virginia courts to deliver the "new case law" that Plaintiff seeks.

this case, Dkt. 12-1, Ex. A,[3] appears to be no more than a repurposed version of that which this Court addressed in *Jackson* and found that it did not constitute a contract. As in *Jackson*, the honor code at issue in this case "is not binding upon Liberty as it contains requirements for students only. The promises that Liberty allegedly makes are mere aspirational statements of educational ideals; they are so vague and indefinite that they cannot be enforceable terms." *Jackson*, 2017 WL 3326972, at *7. In fact, the honor code governing Plaintiff's program specifically reads, "The Student Honor Code is not a contract and does not create obligations that bind the university. The university reserves the right to revise the Student Honor Code at any time and for any reason, including an informal amendment to ensure fairness in its procedures." Dkt. 14-1, Ex. A, at 3.

Similarly, the CES Handbook does not create a contractual relationship between Plaintiff and Liberty, because mutuality is clearly absent. In relevant part, the document states, "When students enter this Ph.D. Program, they agree to adhere to all the policies and procedures outlined in the Handbook. Additionally, because the Handbook is revised as Program and/or University policies and procedures evolve, students must review the Handbook each year to remain aware of the Handbook revisions." Dkt. 14-2, Ex. B, at 6. And, in fact, the CES Handbook makes clear that its purpose is merely to "clarify relevant information, policies, procedures, requirements, and expectations of the Ph.D. in Counselor Education and Supervision Program at Liberty." *Id*. Like other university student handbooks, guidelines, and policies, the CES Handbook and Liberty's Honor Code simply do not create a contractual relationship between Plaintiff and Liberty.

---

[3] A court may consider a document outside the complaint when evaluating a motion to dismiss if the document is authentic and integral to the complaint. *Goines v. Valley Community Servs. Bd.*, 822 F.3d 159, 164 (4th Cir. 2016). As the honor code allegedly forms the basis of a contract between the parties to this claim, and the parties do not dispute its authenticity, the Court may consider the document, which was attached to Defendants' memorandum in support of its motion to dismiss. The parties do not dispute that these documents may be considered by the Court.

Plaintiff's third-party-beneficiary theory also fails for a similar reason. Specifically, Liberty's violation of CACREP's Standards cannot form a basis for a contract-based claim under Virginia law because mutuality is absent. This is clear in the first sentence of the 2016 CACREP Standards, Dkt. 4-3, Ex. V, at 24, which begins, "This document includes the final version of the 2016 CACREP Standards that were adopted by the CACREP Board." *Id*. (emphasis supplied). It continues by stating that the Standards are subject to CACREP's supplementation: "Please note that programs planning to seek CACREP accreditation under the 2016 Standards should not consider this a stand-alone document. Over the next several months, CACREP will release additional documents that include updated policies, application procedures, and a description of review processes." *Id*.

The Fourth Circuit, addressing a similar case, found that under Virginia law, standards for accreditation did not constitute an enforceable contract between an educational institution and accreditation body, at least where the accreditation body could "alter the alleged 'contract' at will, and thus [was] not bound by its terms." *Prof. Massage Training Ctr., Inc. v. Accreditation Alliance of Career Schs. & Colls*., 781 F.3d 161, 181 (4th Cir. 2015). Other courts have pointed out that accreditation standards "are akin to regulations established by an administrative body, rather than a contract governing a relationship between two entities." *Irani v. Palmetto Health*, No. 3:14-cv-3577, 2016 WL 3079466, at *49 (D.S.C. July 1, 2016) (quoting *Castrillon v. St. Vincent Hosp. & Health Care Ctr., Inc*., 51 F. Supp. 3d 828, 842 (S.D. Ind. 2014)); *see Chicago Sch. of Automatic Transmissions, Inc. v. Accreditation Alliance of Career Schs. & Colls*., 44 F.3d 447, 449 (7th Cir. 1994) (stating that "accrediting bodies are not engaged in commercial transactions for which state-law contract principles are natural matches. The 'contract' the School wants to enforce is not a

bargained-for exchange but a set of rules developed by an entity with many of the attributes of an administrative agency").

Similarly, the accreditation standards that Plaintiff cites in her complaint do not constitute a contractual agreement between Liberty and CACREP. Without a contract, there cannot be a third-party beneficiary, and so the Court will dismiss Counts II and III against Liberty.

### C. Negligence: Counts IV–IX

A plaintiff who seeks to establish a negligence claim must plead the existence of a legal duty, violation of that duty, and proximate causation which results in injury. *Marshall v. Winston*, 389 S.E.2d 902, 904 (Va. 1990). Negligence is not actionable unless there is a legal duty. *Fox v. Curtis*, 372 S.E.2d 373, 375 (Va. 1988). Thus, the threshold question is whether a duty of care exists, under Virginia law, on the part of a defendant to a plaintiff. *Id*.

Plaintiff claims that Liberty owed a duty of care to her, specifically, duties of reasonable care in "hiring and retaining qualified employees to conduct fair, just, and impartial investigations involving disciplinary matters," "hiring and retaining counseling-program faculty who are professionally competent pursuant to the ACA's code of ethics," "ensuring that such faculty who hold power and authority to determine a student's guilt or innocence of the accused conduct are properly trained and professionally competent to do so," and "acting to protect other students in light of evidence that one or more faculty member's judgment may have been impaired as a result of bias, conflict of interest, or other reason." Dkt. 4 at ¶ 355.

Similarly, she claims that Defendants Dilella, Deacon, Daniel, Moitinho—all Liberty faculty members—owed her a wide variety of duties under the law, including but not limited to a duty of "reasonable care in making reasonable, substantiated allegations against students," duties to "refrain[] from acting with malice or as a result of bias or conflict of interest," "present[] the

facts without distortion or drama to elicit an emergency," "apply[] the ACA's code of ethics evenly across the board to all students," "not [to] singl[e] out one student for discipline while ignoring others who have engaged in the exact same conduct," and to "check[] [their] own conduct to ensure [they are] not impaired by bias, personal animosity, or political agendas against a student." *See id*. at ¶¶ 372, 378, 384, 389.

A federal district court is not empowered to recognize a new common law tort that has not been previously recognized by the Virginia courts. *See Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 348 (4th Cir. 1998). Virginia law does not support the proposition that a university or its administrators owe its students a duty of care in these circumstances. *Doe v. Washington & Lee Univ.*, No. 6:19-cv-00023, 2020 WL 618836, at *10 (W.D. Va. Feb. 10, 2020); *Jackson*, 2017 WL 3326972 at *9; *Doe v. Marymount Univ.*, 297 F. Supp. 3d at 589; *Doe v. Va. Wesleyan Coll.*, No. CL14-6942-01, 2015 WL 10521466, at *10 (Va. Cir. Ct. 2015) (stating that "the college/student relationship does not constitute a special relationship that would impose a duty on [the college] to warn or protect [a student]"); *see also Schieszler v. Ferrum Coll.*, 236 F. Supp. 2d 602, 608–09 (W.D. Va. 2002) ("[I]t is unlikely that Virginia would conclude that a special relationship exists as a matter of law between colleges and universities and their students."). Much like the claim at issue, the plaintiff in *Doe v. Marymount* asserted that the university owed him "a duty to be fair" under Virginia law, and that court disagreed. 297 F. Supp. 3d at 589.

Plaintiff further argues Liberty owed her a legal duty arising from the "relationship" between the Defendant faculty members (Dilella, Deacon, Daniel, and Moitinho) and the Defendant student (Camden), whom she alleges are licensed as professional counselors and are "professionally bound to abide by the ACA's code of ethics toward students/peers in Liberty's counseling programs." Dkt. 4 at ¶ 365–67. This argument is unavailing. Regardless of the

professional licensing status of its faculty, Virginia law does not recognize any special relationship between a university, its faculty, and its students. *See Doe v. Marymount Univ.*, 297 F. Supp. 3d at 589–90. To hold otherwise would be to create a widespread exception within the law for graduate programs that make use of licensed professionals bound by professional codes of ethics, such as medical schools, law schools, psychology programs, and others. *See Chitty v. Liberty Univ.*, No. 6:13-cv-00043, 2013 WL 3877664, at *1 n.2 (W.D. Va. July 25, 2013) (holding that plaintiff failed to state a claim for negligence under Virginia law on the theory that Liberty University Law School breached a duty of care by refusing to comply with American Bar Association rules in its treatment of the plaintiff). A federal court sitting in diversity has no such ability to recognize such a wide exception in state law. *See Doe v. Marymount Univ.*, 297 F. Supp. 3d at 589–90 (citing *Broussard*, 155 F.3d at 348 (4th Cir. 1998). As Plaintiff has not alleged that Liberty or any of its faculty members owed her any legal duty, the Court will dismiss her negligence claims under Count IV through VIII.

Plaintiff's negligence claim against Camden, her classmate, relates back to a single incident during an academic presentation Plaintiff gave during a course in her doctoral program. During the presentation, Camden "challenged" Plaintiff as to "why [she] did not choose one of two alternate diagnoses and why she did not choose a particular treatment protocol." *Id*. at ¶¶ 108–09. Plaintiff insists that in providing this feedback, Camden violated the ACA's code of ethics because he failed "to make appropriate diagnoses on the presenting behaviors" and because of his "insistence on treatment protocols that the therapist is not trained in and which have zero empirical basis for that client, and in [his] imposition of values that video gaming is useful with all clients despite research to the contrary and condemnation against [Plaintiff] for not agreeing with that." *Id*. at ¶ 116. Even taking Plaintiff's positions on diagnoses and appropriate treatment protocols as

true, the allegations she has provided in her complaint simply fail to state a claim for negligence, and indeed, border on utter frivolity. Academic debates over these issues should be left in the classroom, not brought to a courtroom. As such, the Court will dismiss Plaintiff's claim against Camden under Count IX.

### D. Defamation and Defamation Per Se: Counts X–XVII

Plaintiff alleges claims of defamation and defamation per se against Liberty, Dilella, Camden, and Deacon. The alleged defamatory communications attributed to each defendant do not differ between the claims of defamation and defamation per se. As a result of the alleged defamation, Plaintiff contends her Practicum and doctoral program progression were suspended and she was, as a de facto matter, dismissed from the CES PhD program. *Id*. at ¶ 400. The Court will dismiss Plaintiff's defamation actions, including those for defamation per se, because the majority of them are statements of opinion—and thus, as a matter of law, cannot be considered false—and the remaining are qualifiedly privileged communications.

To state a claim for defamation under Virginia law, Plaintiff must allege (1) publication of (2) an actionable statement with (3) the requisite intent." *Jordan v. Kollman*, 612 S.E.2d 203, 206 (Va. 2005). In order to be actionable as defamation, the statement in question "must be both false and defamatory." *Dragulescu v. Va. Union Univ*., 223 F. Supp. 3d 499, 507 (E.D. Va. 2016) (quoting *Kollman*, 612 S.E.2d at 206).

Certain types of actionable statements provide a basis for liability as defamation per se. Specifically, under Virginia law, such actionable statements are limited to those that

> (1) impute to a person a criminal offense of moral turpitude for which the party may be indicted and punished, (2) impute that a person is infected with some contagious disease that would exclude the person from society, (3) impute an unfitness or lack of integrity required to perform official or professional duties, or (4) prejudice a person in his or her profession or trade.

*Mann v. Heckler & Koch Defense, Inc.*, 639 F. Supp. 2d 619, 635 (E.D. Va. 2009) (citing *Wells v. Liddy*, 186 F.3d 505, 522 (4th Cir. 1999)).

The Supreme Court of Virginia has held that "statements that express only the speaker's opinion and not matters of fact are not actionable as defamation because such statements cannot be shown to be false." *Gov't Micro Res., Inc. v. Jackson*, 624 S.E.2d 63, 69 (Va. 2006); *see also Tharpe v. Saunders*, 737 S.E.2d 890, 893 (Va. 2013). This is likewise true for actions for defamation per se. *Tronfeld v. Nationwide Mut. Ins. Co.*, 636 S.E.2d 447, 453 (Va. 2006). Even where a statement is one of fact, it is not false "if its content or imputation is substantially true." *Mann v. Heckler & Koch Defense, Inc.*, 639 F. Supp. 2d 619, 635 (E.D. Va. 2009) (quoting *Kollman*, 612 S.E.2d at 206) (internal quotation marks omitted). "Generally, statements that are relative in nature and depend largely upon the speaker's viewpoint are expressions of opinion." *Dragulescu*, 223 F. Supp. 3d at 507 (quoting *Fuste v. Riverside Healthcare Ass'n*, 575 S.E.2d 858, 861 (Va. 2003)) (internal quotations omitted). Whether a statement is one of fact or one of opinion is a question of law. *Id*.

Statements are defamatory when the words used "carry the requisite defamatory sting to one's reputation," *Dragulescu*, 223 F. Supp. 3d at 507 (quoting *Schaecher v. Bouffault*, 772 S.E.2d 589, 594 (Va. 2015)) (internal quotations omitted), that is, such words "tend to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from association or dealing with him," *id*. (quoting *Schaecher*, 772 S.E.2d at 594. Such words "tend[] to injure one's reputation in the common estimation of mankind, to throw contumely, shame, or disgrace upon him, or which tend[] to hold him up to scorn, ridicule, or contempt, or which is calculated to render him infamous, odious, or ridiculous." *Id*. As with the falsity requirement,

courts make a determination as to whether words are defamatory as "a threshold matter of law." *Id*.

The Supreme Court of Virginia has held that "the common-law defense of qualified privilege survives in defamation actions in Virginia." *Great Coastal Express, Inc. v. Ellington*, 334 S.E.2d 846, 853 (Va. 1993) *overruled on other grounds by Cashion v. Smith*, 749 S.E.2d 526 (Va. 2013); *see Nedrick v. Southside Reg'l Med. Ctr.*, No. 3-19-cv-202, 2020 WL 534052, at *7 (E.D. Va. Feb. 3, 2020) (dismissing plaintiff's defamation claim for failure to state a claim because the communications were qualifiedly privileged). Defendants have asserted this privilege against the defamation claims in this case. Whether a communication is qualifiedly privileged is a question of law for the Court to decide. *Smalls v. Wright*, 399 S.E.2d 805, 807 (Va. 1991). Under Virginia law, "qualified privilege attaches to communications between persons on a subject in which the persons have an interest or duty." *Cashion v. Smith*, 749 S.E.2d 526, 532 (Va. 2013) (internal quotations and alterations omitted). However, such privilege can be "defeated by proof that the defamatory statements were made maliciously." *Fuste*, 575 S.E.2d at 863.

The malice required to overcome qualified privilege is "behavior actuated by motives of personal spite, or ill-will, independent of the occasion on which the communication was made." *Id*. (quoting *Gazette, Inc. v. Harris*, 325 S.E.2d 713, 727 (Va. 1985)) (internal quotation marks omitted). Further, "the question whether a defendant was actuated by malice, and has abused the occasion and exceeded [the] privilege is a question of fact for a jury." *Fuste*, 575 S.E.2d at 863 (internal quotation omitted). "Thus, in order to state a claim for defamation, plaintiff must allege facts . . . that the statements of her supervisors and co-workers were made with actual, common-law malice." *Echtenkamp v. Loudon Cty. Pub. Sch.*, 263 F. Supp. 2d 1043, 1061–62 (E.D. Va. 2003).

The vast majority of Plaintiff's defamation claims fail even without an assertion of this privilege, because they fail to allege statements that are false or defamatory; the remaining claims fail because those communications are qualifiedly privileged.

1. Dilella and Camden

Plaintiff alleges that Dilella defamed Plaintiff through statements in the two incident reports she filed with Liberty against Plaintiff. First, Plaintiff alleges that Dilella defamed Plaintiff by alleging in her 2018 Incident Report that Plaintiff had been "extremely 'defensive' during her June 5, 2018 presentation." *Id*. at ¶ 434. Plaintiff claims that Dilella "intentionally concealed the fact that [Plaintiff's] responses were legitimate rebuttals to Camden's unethical treatment suggestions." *Id*. Plaintiff conclusorily adds that Dilella "knew or should have known that her statements were false" and that they were made with malicious intent. *Id*. at ¶¶ 437–38. Further, Plaintiff contends that Dilella defamed her in the 2017 Incident Report she filed against the Plaintiff—addressing an exchange between the two parties relating to Plaintiff's request to reconsider a grade she had received in Dilella's course. In that incident report, Dilella alleged Plaintiff was

> impaired by interpersonal/personal problems (inappropriate interpersonal skills; lacks self-control (anger, impulse control) in relationships; lacks awareness of the impact they have on others; and does not take responsibility for deficiencies and/or problems); lacked professional competence (inappropriate affect in response to faculty, peers, supervisors, or clients; does not recognize limitations of expertise and competence); and lacked professional and personal integrity and maturity (makes false, misleading or deceptive statements).

Dkt. 4 at ¶ 439 (quoting Dkt. 4-2, Ex. Q, at 5).

The allegedly defamatory statements that Dilella made in her 2017 Incident Report against Plaintiff were her own opinions as to Plaintiff's personal characteristics, such as Plaintiff's interpersonal skills, self-control, professional competence, and degree of personal integrity. Dkt. 4 at ¶ 439 (quoting Dkt. 4-2, Ex. Q, at 5). Dilella's statements in the 2018 Incident Report she filed

against the Plaintiff, which stated the Plaintiff had been "extremely 'defensive' during her June 5, 2018 presentation," *id*. at ¶ 434, were also statements of opinion—not just on the tenor of the academic exchange between Plaintiff and Camden during Plaintiff's presentation, but also on the merits of Plaintiff's rebuttal of Dilella and Camden's alternative diagnoses and treatment protocols.

Plaintiff also claims that Dilella defamed Plaintiff in the 2018 Incident Report that she filed against the Plaintiff by intentionally misrepresenting the equine therapy services Plaintiff provided to children as counseling treatment. *Id*. at ¶ 432. Specifically, Plaintiff claims that "Dilella reported that [Plaintiff] was at imminent risk of harming Practicum clients during the Summer of 2018 through such equine bonding services" and as a result, Plaintiff states that her Practicum "was halted on an emergency basis." *Id*. Plaintiff insists that the reference to her equine bonding services in Dilella's 2018 Incident Report (which related concerns about her behavior during her June 2018 presentation) implies that Plaintiff spoke about her equine therapy during her presentation, which she vehemently denies doing. *Id*. at ¶ 433. Plaintiff claims that Dilella inaccurately represented, or otherwise implied, that her equine bonding services were ongoing as of the summer of 2018. She also alleges that Dilella made misrepresentations in her 2018 Incident Report as to how Plaintiff was providing these services to children, *see id*. at ¶ 188, alluding to the following passage:

> Additionally, a particular problem arises in her situation due to the highly specialized and autonomous nature of her current practicum site (i.e., her own home, without an on-site supervisor, providing equine therapy to adopted/traumatized children . . . . Lastly peers have raised concerns about the ethical appropriateness and potential harm of the interventions [Plaintiff] has described using (e.g., blindfolding a child, putting him/her on a horse, and allowing the caregiver to call out for the child while the child cries; detailed on her website [web link]. This raises concern ethically, legally, and with regard to certification/licensing professional standards.

Dkt. 4-2, Ex. R, at 42. Plaintiff argues repeatedly that Dilella had no authority or right to evaluate her equine bonding services, because the information was housed on a ministry website she personally maintained.

Plaintiff alleges that Camden was the one who initially reported to Dilella Plaintiff's "harmful [counseling] interventions" using horses. *Id*. at ¶ 450. Plaintiff claims that in doing so, Camden "independently defamed [Plaintiff] by deliberately, recklessly, or negligently distorting information about [her] and the non-profit ministry she and her husband run." *Id*. at ¶ 452. The allegations make clear that Plaintiff was in fact using horses as part of a counseling program for her ministry clients. *See, e.g.*, *id*. at ¶¶ 182, 187. Whether Camden felt such techniques were harmful is a matter of his own opinion. Thus, the Court will dismiss the defamation and defamation per se claims against him under Counts XII and XVI.

Even if Dilella's alleged misrepresentations of Plaintiff's equine therapy services were factual and defamatory, they are protected by qualified privilege. *See Cashion*, 749 S.E.2d at 532 (whether a statement is protected by qualified privilege is a question of law). Here, Dilella serves as an instructor to Plaintiff as part of her doctoral program in counseling. Dilella's representations and concerns about Plaintiff's equine therapy program are made in her role as an instructor and faculty member of Plaintiff's doctoral program in counseling, and such communications were made to other university faculty members through the program's incident reporting system.[4]

---

[4] Plaintiff argues that "Camden and/or Liberty CES faculty have discussed Liberty's confidential findings with third parties and defamed Jane by making statements orally and in writing to Liberty administrators and students regarding [her] situation. This is evidenced by a classmate of both Camden and [Plaintiff] posting a meme in the [Liberty counseling master's program] Facebook group that publicly mocked and ridiculed [Plaintiff]. That student was not involved in [Plaintiff's] matter at all and would only know about it from Camden or Liberty CES faculty." Dkt. 4 at ¶ 59. This claim is wholly speculative. Plaintiff's allegations include no specific factual content that indicates Dilella or any other defendant faculty member related their allegedly

Regardless of whether Plaintiff's equine therapy formed the basis of her Practicum or any clinical approach for counseling clients rather than her ministry clients, Dilella had an "interest or duty" in such conduct. *Id.* at 532. Plaintiff's ongoing use of such therapeutic methods with any client—regardless of category—at the time when Plaintiff was a candidate for her doctorate in counseling was clearly relevant to the subject of Plaintiff's fitness as a candidate for that program. *See Smalls*, 399 S.E.2d at 807. As an instructor in that PhD program and a faculty member of Liberty, Dilella had an "interest or duty" in measuring the fitness of doctoral candidates like Plaintiff. Thus, the Court holds that Dilella's communication was qualifiedly privileged.

The Supreme Court of Virginia has provided a "non-exhaustive list of elements" of common-law malice and the abuse of qualified privilege:

(1) The statements were made with knowledge that they were false or with reckless disregard for their truth;
(2) The statements were communicated to third parties who have no duty or interest in the subject matter;
(3) The statements were motivated by personal spite or ill will;
(4) The statements included strong or violent language disproportionate to the occasion; or
(5) The statements were not made in good faith.

*Cashion*, 749 S.E.2d at 533. Despite the variety of ways in which a plaintiff may plead common-law malice, Plaintiff's allegations fail to displace the qualified privilege. Indeed, Plaintiff has done no more than make conclusory allegations that Dilella was motivated by such malice in making these comments about Plaintiff's equine therapy program, Dkt. 4 at ¶ 180, and conclusory allegations are not entitled to a presumption of truth when they "devoid of further factual enhancement" to support the assertion, *see Iqbal*, 556 U.S. at 678. Indeed, in her memorandum in opposition to the motion to dismiss, Plaintiff was unable to point to anything other than conclusory

---

defamatory communications to individuals who had no interest in their content—which would have been excepted from the privilege.

allegations such as, "These facts document Dilella's selective enforcement, personal animus, malice, and ill will towards [Plaintiff]," or some variation thereof. *See* Dkt. 16-1 at 31 (citing Dkt. 4 at ¶¶ 180, 268, 475, 513). But these are no more than legal conclusions couched as factual allegations, which are not entitled to a presumption of truth. *Twombly*, 550 U.S. at 555.

At bottom, Plaintiff's complaint lacks well-pleaded factual allegations which, taken as true at this stage of the case, plead malice required to displace the qualified privilege. And Plaintiff's bare, "[r]epeated assertions that a party acted with malice or with a motive of personal spite is not sufficient; rather, such conclusory language does not state a claim for malice if the facts as alleged cannot support a finding as such." *Ortiz v. Panera Bread Co.*, No. 1:10-cv-1424, 2011 WL 3353432, at *5 (E.D. Va. Aug. 2, 2011) (internal citations omitted); *see Zarelli v. City of Norfolk*, No. 2:13-cv-447, 2014 WL 2860295, at *11 (E.D. Va. June 23, 2014) (dismissing defamation claim for failure to plead more than conclusory allegations of malice). Thus, to the extent that Dilella's comments relating to Plaintiff's equine therapy could even be considered defamatory, they are qualifiedly privileged and the defamation and defamation per se claims against Dilella under Counts XI and XV will be dismissed. *See Verrinder v. Rite Aid Corp.*, No. 3:06-cv-00024, 2006 WL 2375630, at *1 (W.D. Va. Aug. 11, 2006) (citing *Echtenkamp*, 263 F. Supp. 2d at 1062) (stating that a claim may survive a motion to dismiss if the Plaintiff makes more than conclusory allegations of malice and describes a greater pattern of animus by the defendant); *see also Nedrick*, 2020 WL 534052, at *9 (holding that claims were protected by qualified privilege and granting motion to dismiss).

2. Deacon

Plaintiff claims that Deacon is liable for defamation for "filing an Incident Report against [Plaintiff] for conduct that (a) was outside the scope and reach of Liberty CES, and (b) did not constitute any improper clinical skills or professional competencies." Dkt. 4 at ¶ 411. In her incident report and related email communications, Deacon allegedly implied that Plaintiff "was asserting an authoritative position and disseminating CES 'information' without permission to do so." Dkt. 4 at ¶ 463. In making these allegations, Plaintiff is referring to a set of Plaintiff's comments about the Liberty CES Program's accreditation status that were made in a "private, non-Liberty-run Facebook group that Plaintiff is a member and administrator of in her capacity as an alumnus of Liberty's master's program in professional counseling." *Id*. at 13.

Exhibits F and G to the complaint demonstrate that Plaintiff's comments on Facebook relayed information about CACREP accreditation requirements and Liberty's CACREP accreditation status and history. Dkt. 4-1, Ex. F, at 27. Plaintiff attached Deacon's incident report containing Deacon's allegedly defamatory statements, which included claims that the information Plaintiff was disseminating through this Facebook group was wholly inaccurate and discredited the quality of Liberty's CES curriculum and faculty credentials. Deacon stated that she was also "concerned that [Plaintiff] misrepresented the level of access" she had to credible departmental information based on comments Plaintiff made in the Facebook group, such as, "I work for [Liberty] and there are faculty members in this group monitoring to ensure that we disseminate accurate information." Dkt. 4-1, Ex. F, at 27. Specifically, Deacon stated that Plaintiff's statement "implie[d] that [her] position at Liberty gives [her] credible access to the information" because Plaintiff did not clarify that her employment was at Liberty's Writing Center, not the Department of Counselor Education & Family Studies." *Id.*

Although it is not clear how it relates to her defamation claim, Plaintiff presses that that all of these comments were made outside the scope of the doctoral program, and the comments did not "reflect adversely on [her] professional identity or academic aptitude and are protected by the First Amendment." *Id*. at ¶ 93. Because Deacon, in her incident report, implied that Plaintiff was "asserting an authoritative position and disseminating Liberty CES 'information' without permission to do so," Plaintiff claims that Deacon has defamed her by implication, painting her "as a rogue, renegade student who was professionally unstable." *Id*. at 412.

In order to state a claim for defamation by implication, Plaintiff must allege: "(1) that the defendants made the statements alleged in the complaint, (2) that the statements, even if facially true, were designed and intended by the defendants to imply [the defamatory meaning], (3) that in the light of the circumstances prevailing at the time they were made, the statements conveyed that defamatory implication to those who heard or read them, and (4) that the plaintiff suffered harm as a result." *Pendleton v. Newsome*, 772 S.E.2d 759, 765 (Va. 2015). As with a typical claim for defamation, defamation by implication can be defeated by a finding that the statement was not defamatory or where the communication was qualifiedly privileged. *See Jackson*, 2017 WL 3326972, at *10, 14.

As with Dilella, Deacon's statements are qualifiedly privileged. Deacon serves as the CACREP Liaison and program director for two of Liberty's counseling programs. Dkt. 4-1, Ex. F, at 27. Deacon's allegedly defamatory remarks relate to her concerns and impressions of the content of Plaintiff's comments about the Liberty CES program's accreditation status, and the remarks were communicated with the academic department's PhD Program Director, Dr. Sosin, and, eventually, the CES program's Remediation Committee. Communications are qualifiedly privileged when they are "between persons on a subject in which the persons have an interest or

duty." *Cashion*, 749 S.E.2d at 532. When considering Plaintiff's allegations and supporting documentation attached to her complaint, there can be no question that Deacon, in her role as a faculty member within Liberty's Department of Counseling & Family Affairs—and what is more, the accreditation liaison—had such an "interest" in the subject underlying Deacon's allegedly defamatory comments: Plaintiff's spreading of information about the accreditation status and history of that department. This is true regardless of whether Plaintiff's information was accurate. Likewise, there can be no question that Dr. Sosin, another Liberty faculty member, and the members of the Remediation Committee who were in receipt of Deacon's allegedly defamatory communication had not just a "corresponding interest" in Plaintiff circulating such information, but an obligation to review such information given their roles in the remediation process. Further, just as with Dilella, Plaintiff has failed to allege more than conclusory allegations of Deacon's malice in making these statements, *see, e.g.*, Dkt. 4 at ¶¶ 268, 464, which the Court need not credit, *Simmons*, 634 F.3d at 768. As such, Deacon's alleged communications were qualifiedly privileged, and the defamation and defamation per se claims against her under Counts XIII and XVII will be dismissed.

    3. <u>Liberty</u>

        Plaintiff's allegations against Liberty are less clear cut, but they appear to be wholly derivative of the claims against Dilella, Camden, and Deacon. *Id*. at ¶ 409 (stating that "Liberty accepted and acted on such defamation"); *id*. at ¶ 410 (stating that "Liberty upheld the disciplinary actions taken against [Plaintiff] on the basis of the defamatory allegations"); *id*. at ¶ 420 (alleging that Liberty, "upon information and belief," acted through its faculty to defame her). Accordingly, the Court will dismiss Plaintiff's claims of defamation and defamation per se against Liberty under Counts X and XIV.

### E. Conspiracy: Counts XVIII–XXIII

Plaintiff alleges that Liberty, Dilella, Camden, Deacon, Daniel, and Moitinho are liable to her for violating Va. Code § 18.2-499, which states in relevant part, "Any two or more persons who combine, associate, agree, mutually undertake or concert together for the purpose of (i) willfully and maliciously injuring another in his reputation, trade, business or profession by any means whatever . . . shall be jointly and severally guilty of a Class 1 misdemeanor." Section 18.2-500 creates a private cause of action for parties injured under this statute, permitting them to recover treble damages.[5] As a consequence of Defendants' alleged conspiracy, Plaintiff alleges that she has suffered the following harm: Defendants' conspiracy has labeled her "professionally incompetent" which has "effectively barred [her] from pursuing licensure under even her qualifying master's degree," damage to her "professional reputation and credibility among her peers, colleagues, and other mental health professionals, including as to her current (and future) publications and presentations," and damage to the professional reputation of the non-profit ministry she and her husband lead, which had featured her equine therapy services. Dkt. 4 at ¶ 517.

---

[5] In her memorandum in opposition to the motion to dismiss, Plaintiff argues that she has also pleaded a claim for common-law civil conspiracy under Virginia law. Dkt. 16-1 at 32 ("In addition, Plaintiff simultaneously pled claims for civil conspiracy that do not require the business damage element of statutory conspiracy.") (citing Dkt. 4 at Counts XVIII through XXIII). The only indication that Plaintiff has indeed pleaded such conspiracy claims is her labeling of Count XVIII against Liberty as "Civil & Statutory Conspiracy." All other conspiracy counts are labeled as "Statutory Conspiracy." What is more, the entirety of Count XVIII relates the conspiracy under Va. § 18.2-499 and the damage she suffered to her trade, business, and profession. Even if the Court were to find that such a claim had been pleaded, it would be dismissed. Under Virginia law, a common-law claim for civil conspiracy "consists of two or more persons combined to accomplish, by some concerted action, some criminal or unlawful purpose or some lawful purpose by a criminal or unlawful means." *Commercial Bus. Sys., Inc. v. Bellsouth Servs., Inc.*, 453 S.E.2d 261, 267 (Va. 1995). But Plaintiff has failed to plead any unlawful or criminal conduct taken in furtherance of the conspiracy. She argues that Dilella, Deacon, and Camden "resorted to defamation and defamation per se, but the crux remains the conspiracy and those other torts were committed in addition to (and indeed in furtherance of) the statutory conspiracy." As this opinion details, however, Plaintiff has failed to state a claim for any action in tort against any of the defendants in this action. As such, any claim for civil conspiracy would fail.

Ultimately, Plaintiff must prove that Defendants "combined together to effect a preconceived plan and unity of design and purpose." *Bay Tobacco, LLC v. Bell Quality Tobacco Prods., LLC*, 261 F. Supp. 2d 483, 499 (E.D. Va. 2003) (internal quotation marks omitted). After all, this "common design is the essence of the conspiracy." *Id.* To survive a motion to dismiss, then, a plaintiff "must at least plead the requisite concert of action and unity of purpose," *id.*, and must do so "in more than mere conclusory language," *id.* (internal quotation marks omitted). *See Schlegel v. Bank of Amer., N.A.*, 505 F. Supp. 321, 325–26 (W.D. Va. 2007). "[A] conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality." *Twombly*, 550 U.S. at 557. Allegations that two Defendants "conspired" together "get[] the complaint close to stating a claim, but without some further factual enhancement [they] stop short of the line between possibility and plausibility of 'entitle[ment] to relief.'" *Id.* at 557; *id.* at 556–57 ("Without more, parallel conduct does not suggest conspiracy."). Instead, Plaintiff "must show an agreement or a meeting of the minds by [the] defendants to" accomplish the conspiracy's purpose. *A Soc'y Without A Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011); *id.* at 347 (a claim for civil conspiracy fails if the plaintiff "fails to allege with any specificity the persons who agreed to the alleged conspiracy, the specific communications amongst the conspirators, or the manner in which any such communications were made").

Plaintiff alleges that the incident reports that the Liberty faculty defendants filed against her coincided with a December 8, 2017 email on which she was "accidentally 'cc'ed,'" Dkt. 4 at ¶ 14, which stated that Plaintiff would "not go quietly." Dkt. 4-1, Ex. A, at 2.[6] This email was not sent to Dilella, Camden, or Daniel; the only defendants on the email were Mary Deacon and Elias

---

[6] To provide additional context, the entirety of this portion of the email reads, "But I know that she's not going to go quietly[.] And honestly, I do not want to be involved in the firestorm she was [*sic*] about to rain down on us." Dkt. 4-1, Ex. A.

Moitinho. *Id*. Other than this email, Plaintiff alleges "no agreement or . . . meeting of the minds."

*A Soc'y Without A Name*, 655 F.3d at 346. Given that Camden and Dilella were not privy to this

alleged agreement, Plaintiff relies wholly on bare allegations that Dilella and Camden conspired

against her, claiming "each of the allegations against [her] were timed and coordinated" in

furtherance of the "internal agenda" to oust her. *Id*. at ¶ 496. For example, she claims that

> Dilella conspired with [Plaintiff's] classmate and fellow student Eric Camden in
> June of 2018 to bait [Plaintiff] into responding 'defensively' in order to force her
> suspension.' Because [Plaintiff's] research focus and client population is very, very
> narrow, Dilella and Camden knew how to get [Plaintiff] to respond defensively so
> they could accuse her of not accepting feedback from her professor peers (i.e.,
> professional incompetence).

*Id.* at ¶ 511. At best, her allegations suggest that the Dilella and Camden acted in parallel—but she

does not make any allegations of an agreement. Her conspiracy allegations against Daniel are even

more sparse. In fact, Plaintiff simply relies on the allegation that Daniel filed her November 17,

2017 Incident Report against her just a few weeks prior to the date of the email stating that Plaintiff

would "not go quietly." This sort of speculation lacks the sufficient factual content to survive

dismissal under *Twombly*. As Plaintiff has failed to allege any agreement between Dilella,

Camden, or Daniel and other individual, the Court will dismiss the conspiracy claims against these

three defendants under Counts XIX, XX, and XXII.

Plaintiff's conspiracy claims against Liberty, Moitinho, and Deacon fail, because under

Virginia's doctrine of intracorporate immunity, "a single entity cannot conspire with itself." *Fox*

*v. Deese*, 362 S.E.2d 699, 708 (Va. 1987); *ePlus Tech., Inc. v. Aboud*, 313 F.3d 166, 179 (4th Cir.

2002) ("[U]nder the intracorporate immunity doctrine, acts of corporate agents are acts of the

corporation itself, and corporate employees cannot conspire with each other or with the

corporation."); *Mician v. Catanzaro*, No. 2:17-cv-548, 2018 WL 2977398, at *5 (E.D. Va. June

13, 2018) ("[A] single entity, like a corporation, cannot conspire with itself because

a conspiracy requires two or more persons."). Likewise, "an agent cannot conspire with its principal." *Michigan Mut. Ins. Co. v. Smoot*, 128 F. Supp. 2d 917, 925 (E.D. Va. 2000); *Mician*, 2018 WL 2977398, at *5 ("[A] conspiracy action cannot lie where a principal and its agent, or two agents of the same principal, are alleged to conspire with one another."). However, employees or agents of the same entity can conspire together if they are acting outside the scope of their employment or agency. *See Rosenthal v. R.W. Smith Co.*, 260 F. Supp. 3d 588, 593–94 (W.D. Va. 2017) ("[T]here cannot be a conspiracy between agents of a corporation operating within the scope of their duties."); *Vollette v. Watson*, 937 F. Supp. 2d 706, 727 (E.D. Va. 2013) ("[T]he 'intracorporate immunity doctrine,' which has been adopted by the Virginia Supreme Court and the Fourth Circuit, deems multiple defendants a single entity for the purpose of analyzing a civil conspiracy claim if such defendants are employees or agents of the same entity and are acting within the scope of their employment/agency." (emphasis in the original)).

Therefore, Plaintiff's allegations must establish as plausible that at least one of these Defendants was acting outside the scope of their employment with Liberty or that the Defendants have acted with another individual not in Liberty's employ. She has failed to do either.

> In her complaint, Plaintiff alleges that
>
> Deacon, Dilella, Daniel, and/or Moitinho acted together as agents of Liberty, as well as with student Eric Camden in concerted action with malice to harm [Plaintiff]. Though student <u>Camden was not acting as an agent of Liberty at any time, and thus satisfies the second acting party required to meet the statutory requirements of business conspiracy</u>, at times, some or all of Dilella's, Deacon's, Daniel's, and/or Moitinho's actions and conduct fell outside the reasonable scope of their employment duties and powers (which might otherwise have given Liberty an opportunity to skirt responsibility under the statutes).

Dkt. 4 at ¶ 514 (emphasis supplied). The Court has dismissed the conspiracy claim against Camden, and Plaintiff merely conclusorily alleges that the individual faculty members were acting outside the reasonable scope of their employment with Liberty. In fact, everything in her

allegations and the documents attached to it point to the opposite conclusion: Deacon and Moitinho—and for that matter, Dilella and Daniel—were acting wholly within the scope of their roles as Liberty's agents. Here, all of these defendants' actions took place through university-sponsored channels, such as the incident-reporting system and remediation process and all of the defendants were taking action pursuant to their roles and titles as Liberty faculty members. In fact, the actions they took in evaluating a student's fitness as a doctoral candidate are almost categorically the role of a university and its faculty.[7] For instance, much of the conduct underlying Dilella's alleged contribution to the conspiracy took place as part of an academic exchange with the Plaintiff about the content of a class presentation she gave; Deacon's alleged conduct involved an email she sent to Plaintiff (and subsequently filed as an incident report against Plaintiff), which challenged the accuracy of information that Plaintiff was spreading about a Liberty program, and Deacon expressly invoked her university titles in challenging it; Daniel's alleged role in the conspiracy is wholly based upon an incident report she gave providing negative feedback to Plaintiff about conduct that occurred in a class for which she acted as the instructor; and Mointinho is alleged to have participated in the conspiracy based on his "biased" review of Plaintiff's appeal of the remediation committee's decision. *Cf. Vollette v. Watson*, 937 F. Supp. 2d 706, 727–28

---

[7] Plaintiff alleges that, at least with regard to Dilella, the actions were taken against Plaintiff in order to chill Plaintiff from publishing research that would "indirectly" challenge "establishment" faculty and their research. While it does not appear that Plaintiff has alleged that Dilella was one of those whose research might have been challenged by Plaintiff's theories, she claims that Dilella was aligned with such faculty and traveled (along with Camden) to Ukraine to assist with such "establishment" research. Dkt. 4 at ¶¶ 501–09. But while the Fourth Circuit has recognized a "personal stake" exception to conspiracies under some federal statutes not implicated here, Virginia courts have not recognized the same under Virginia law. *Foster v. Wintergreen Real Estate Co.*, 81 Va. Cir. 353, 2010 WL 11020447, at *6 (Va. Cir. Ct. Nov. 16, 2020); *Tomlin v. Int'l Bus. Machs. Corp.*, 84 Va. Cir. 280, 2012 WL 7850902, at *14 (Va. Cir. Ct. Feb. 13, 2012). Thus, such allegations do not impact the Court's conclusion that Dilella was acting within the scope of her employment when she took the actions underlying her role in the alleged conspiracy.

(E.D. Va. 2013) (finding intracorporate immunity applied where challenged acts "occurred at [defendants'] regular place of employment, during their regular working hours, at the direction of their superior . . . and were directly related to their employment duty to help oversee the [facility]"). As all of these acts make clear that the faculty defendants were acting within the scope of their employment with Liberty, the doctrine of intracorporate immunity applies. Since Liberty cannot act in concert with its agents and Plaintiff did not adequately allege that Camden acted as a co-conspirator, Plaintiff has failed to allege an agreement between two or more individuals, and therefore she has failed to state a claim for relief under Va. Code § 18.2-499. Her remaining conspiracy claims against Liberty, Deacon, and Moitinho under Counts XVIII, XXI, and XXIII will be dismissed.

### F. Intentional and Negligent Infliction of Emotional Distress: Counts XXIV–XXVIII

1. <u>Intentional Infliction of Emotional Distress: Counts XXIV–XXVII</u>

Claims for intentional infliction of emotional distress carry "disfavored status" under Virginia law. *A.H. v. Church of Christ, Inc.*, 831 S.E.2d 460, 476 n.18 (Va. 2019). To state a claim for intentional infliction of emotional distress ("IIED"), the plaintiff must plead that (1) the defendant's conduct was intentional or reckless; (2) the conduct was outrageous or intolerable; (3) there was a causal connection between the defendant's conduct and the plaintiff's emotional distress; and (4) the resulting emotional distress was severe. *Rose v. Centra Health, Inc.*, No. 6:17-cv-00012, 2017 WL 3392494, at *14 (W.D. Va. Aug. 7, 2017) (citing *Almy v. Grisham*, 639 S.E.2d 182, 186 (Va. 2007)). Because Plaintiff fails to allege facts sufficient to satisfy the elements of this claim, Defendant's motion to dismiss will be granted.

The Supreme Court of Virginia has held that to state a claim for IIED, the resulting emotional distress must be "so severe that no reasonable person could be expected to endure it."

*Id*. at 188 (quoting *Harris v. Kreutzer*, 624 S.E.2d 24, 34 (Va. 2006)). Further, the alleged conduct underlying IIED must be "so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Almy*, 639 S.E.2d at 187. "It is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery . . . . [Where] reasonable men may differ, it is for the jury, subject to the control of the court, to determine whether, in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability." *Womack v. Eldridge*, 210 S.E.2d 145 (Va. 1974); *see Dao v. Faustin*, 402 F. Supp. 3d 308, 321 (E.D. Va. 2019). "Under Virginia law, neither tortious intent, criminal intent, malicious intent, nor conduct worthy of punitive damages is sufficient to fulfill the 'outrageous' element of an intentional infliction of emotional distress claim." *Daniczek v. Spencer*, 156 F. Supp. 3d 739, 759–60 (E.D. Va. 2016) (citing *Russo v. White*, 400 S.E.2d 160, 162 (Va. 1991)).

Plaintiff claims that Liberty is liable to her for IIED because it knew or should have known that finding her responsible for "its faculty members' patently frivolous charges," making use of an allegedly "fundamentally flawed disciplinary process," and its resulting sanction upon Plaintiff would cause her severe emotional distress. Dkt. 4 at ¶ 551. Plaintiff alleges that Dilella, Camden, and Deacon are similarly liable because they each knew or should have known that making "patently frivolous claims" against her and "effectively labeling her as professionally impaired and incompetent" would cause her severe emotional distress. Id. at ¶¶ 558, 565, 572.

For all applicable defendants, Plaintiff fails to plead sufficient factual allegations to satisfy the "outrageous or intolerable conduct" element of an IIED claim, because no reasonable person could view the alleged conduct as "so outrageous in character and so extreme in degree, as to go

beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Almy*, 639 S.E.2d at 187. This bar is not easily met. For example, the Supreme Court of Virginia held in *Harris v. Kreutzer*, that a plaintiff who received a court-ordered medical examination as part of a personal injury action seeking damages resulting from a traumatic brain injury brought about by a car accident had not suffered "outrageous" treatment from the defendant doctor who examined her, where she had alleged that he "verbally abused [her], raised his voice to her, caused her to break down into tears in his office, stated she was 'putting on a show,' and accused her of being a faker and malingerer." 624 S.E.2d 24, 33 (Va. 2006). This was despite that plaintiff's allegations that the defendant doctor knew that she had "a medical history of a nervous problem, had been the victim of armed robberies, suffered from post-traumatic stress disorder, and was suicidal." *Id.* at 27 n.5.

If the plaintiff in *Harris* cannot be said to have suffered conduct that meets the "outrageousness" threshold under Virginia law, then the Court does not see how Plaintiff's allegations that she had to endure what she calls a "fundamentally flawed" remediation process could meet that bar. This is particularly true where the only indication that Plaintiff should receive a proceeding in accordance with notions of due process is derived from a university policy handbook. *Cf. Doe v. Marymount Univ.*, 297 F. Supp. 3d at 588 ("Under Virginia law, a University's student conduct policies are not binding, enforceable contracts; rather, they are behavior guidelines that may be unilaterally revised by Marymount at any time."). What is more, Plaintiff's own factual allegations detailing her exchange with Dilella and Camden during her June 2018 presentation suggest that the "patently frivolous charges," *see, e.g.*, Dkt. 4-2, Ex. R (Incident Report for Infractions of Behavioral Standards, including email communications between Plaintiff

and Dilella), that Liberty reviewed through the remediation committee were anything but frivolous. Dkt. 4 at ¶¶ 107–119.

The Court finds persuasive that other federal courts sitting in diversity, adjudicating IIED claims under Virginia law, have found facts far worse that these not to be outrageous as a matter of law. *See, e.g.*, *Davis v. Wal-Mart Stores East, L.P.*, 177 F. Supp. 3d 943, 953 (E.D. Va. 2016), *vacated on other grounds by* 687 F. App'x 307 (holding that defendant who "made arguably false statements to law enforcement, disclosed confidential information, played a role in the arrest of [plaintiff], and failed to timely report additional information" in relation to reporting potential prescription fraud did not engage in "outrageous" conduct sufficient for IIED claim because the allegations demonstrated that defendant had a legitimate concern); *Crittenson v. Arai Amers., Inc.*, No. 2:13–cv–567, 2014 WL 31490, at *6–7 (E.D. Va. Jan. 3, 2014) (finding the "outrageous" prong was not met where defendants filed false claims that plaintiff stole from company and started rumors that plaintiff had planned drive-by shooting that would take place on company property); *Warner v. Buck Creek Nursery, Inc.*, 149 F. Supp. 2d 246, 252–53 (W.D. Va. 2001) (finding the "outrageous" prong was not met where defendants had fabricated an accusation that plaintiff stole from them in retaliation for exercising ERISA rights in an attempt to destroy plaintiff's reputation). As the Court cannot find Liberty, Dilella, Camden, and Deacon's conduct "outrageous" as required for an IIED claim under Virginia law, it will dismiss Counts XXIV through XXVII for failure to state a claim on which relief can be granted.

2. Negligent Inflicction of Emotional Distress: Count XXVIII

Under Virginia law, claims for negligent infliction of emotional distress ("NIED") are "limited." *Dao*, 402 F. Supp. 3d at 321; *Earley v. Marion*, 540 F. Supp. 2d 680, 690 (W.D. Va. 2008) ("Virginia courts hold litigants to a rigorous standard for negligent infliction of emotional

distress claims"). In its opinion recognizing NIED as a cause of action in Virginia, the Supreme Court of Virginia held that

> where the claim is for emotional disturbance and physical injury resulting therefrom, there may be recovery for negligent conduct, notwithstanding the lack of physical impact, provided the injured party properly pleads and proves by clear and convincing evidence[8] that his physical injury was the natural result of fright or shock proximately caused by the defendant's negligence. In other words, there may be recovery in such a case if, but only if, there is shown a clear and unbroken chain of causal connection between the negligent act, the emotional disturbance, and the physical injury.

*Hughes v. Moore*, 197 S.E.2d 214, 219 (Va. 1973); *see Dao*, 402 F. Supp. 3d at 321. The test of the defendant's conduct is a subjective one: courts are to measure it "by the reaction to be expected of a normal person," in the absence of any specific knowledge of a plaintiff's "hypersensitivity." *Hughes*, 197 S.E.2d at 219.

Importantly, Virginia law requires that a Plaintiff plead "symptoms or manifestations of *physical injury*, not merely of an underlying emotional disturbance." *Myseros v. Sissler*, 387 S.E.2d 463, 466 (Va. 1990) (internal quotations and citations omitted) (emphasis supplied); *Dao*, 402 F. Supp. 3d at 321 (stating that "the plaintiff must allege and prove that he suffered a physical injury that differs from the symptoms of an emotional disturbance, not a physical ailment caused by emotional distress") (internal quotations, citations, and alterations omitted). In *Myseros*, the plaintiff had gotten into a car accident on the Capital Beltway and, consequently, was forced to exit his vehicle and run out onto the median strip, narrowly avoiding oncoming highway traffic. Although he exhibited "sweating, dizziness, nausea, difficulty in sleeping and breathing,

---

[8] It is worth noting that in Virginia courts, plaintiffs face a heightened pleading requirement for claims asserting negligent or intentional infliction of emotional distress. As Plaintiff has filed her claim in federal court, however, federal pleading requirements under Rule 8 apply. *See Daniczek v. Spencer*, 156 F. Supp. 3d 739, 758–59 (E.D. Va. 2016). Regardless of which pleading standard were to apply, Plaintiff has still failed to state a claim.

constriction of the coronary vessels, two episodes of chest pain, hypertension, unstable angina, an electrocardiogram showing marked ischemia, loss of appetite and weight, change in heart function, and problems with the heart muscle," all of which left him "disabled from all work," *id*. at 465, the Court found that he was not entitled to relief under an NIED theory. The Court considered such conditions to be "symptoms" and "manifestations" of anxiety, *id*., and thus the result of an underlying emotional disturbance, rather than the result of physical injury, as required under for NIED claims in Virginia.

Plaintiff claims that Liberty is liable to her for negligent infliction of emotional distress, because it owed her a duty to protect her from the administrative misconduct of its faculty when she participated in the remediation program under protest. Dkt. 4 at ¶ 579. As a result of its failure to do so, she claims that she has suffered "physical harm, including severe emotional distress." *Id*. at ¶ 582.

In order to state a claim for NIED, a plaintiff must establish that the defendant breached "an underlying tort duty of care." *A.H. v. Church of Christ, Inc*., 831 S.E.2d at 477. Plaintiff's claim fails as a matter of law for this reason alone, because as already discussed, Plaintiff has failed to establish that Liberty owed her such a duty. *See* Part IV.C.1. But even if such a duty had been shown, it can hardly be said that the Plaintiff in this case has suffered an experience that would result in "fright or shock" under *Hughes*,[9] and indeed, Plaintiff does not plead as much. *See Blakeman v. Emergency USA*, No. CL-2010-6648, 83 Va. Cir. 269, 2011 WL 8947567, at *7 (Va. Cir. Ct. Aug. 17, 2011) ("Unlike *Hughes*, the Amended Complaint does not allege that Plaintiff

---

[9] For example, in *Hughes*, "Plaintiff was standing in a doorway of her house between the kitchen and living room, looking through a picture window, when she heard a noise and saw the headlights of defendant's car shining into her living room. The car crashed into the front porch of the house, and after the initial collision the car moved back and forth against the porch several times." 197 S.E.2d at 215.

suffered from immediate fright or shock as a result of Defendants' actions. Instead, Plaintiff alleges that he suffered from humiliation, embarrassment, depression, insomnia, irritability, and anger after receiving the test results.").

Further, similar to the plaintiff in *Myseros*, Plaintiff pleads that she is "deeply depressed and anxious, has lost weight, is no longer able to sleep through the night, and has long-term medical complications as a direct result of the stress caused by Liberty and the other Defendants."[10] Dkt. 4 at ¶ 582. Under the law as stated in *Myseros*, these conditions are symptoms of her underlying emotional disturbance, such as from the depression and anxiety she has pleaded, rather than a physical injury resulting from immediate fright or shock as a result of Liberty's actions. *See McClary v. Greyhound Lines, Inc*., 2017 WL 3725992, at *3 (W.D. Va. Aug. 29, 2017) (finding that plaintiffs failed to state a claim for NIED where they suffered "extreme stress" manifesting as "physical shaking, interrupted sleep, panic attacks, and altered eating habits" as well as "elevated and erratic" blood pressure); *Pacquette v. Nestle USA, Inc.*, No. 4:06-cv-00060, 2007 WL 1343794, at *6 (W.D. Va. May 7, 2007). Thus, as in *Myseros*, Plaintiff has failed to allege the necessary "physical injury" prong of her NIED claim.

Plaintiff's NIED claim against Liberty has fails on three independent grounds: failure to allege that Liberty owed her an underlying duty of care, failure to allege any action that would lead

---

[10] Plaintiff provides detail in her memorandum in opposition to the motion to dismiss as to the medical complications she has suffered, including a shoulder impingement, dental issues from grinding her teeth at night, rectal bleeding, laryngospasm resulting from an allergic reaction to anesthesia used during a colonoscopy to investigate her rectal bleeding, a partial tearing of her rotator cuff and pulmonary embolism resulting from complications due to her laryngospasm, and (inexplicably related to these defendants' alleged conduct) bilateral pneumonia and sepsis. These details were not included in her complaint, and thus the Court cannot consider them in its review. *Yesko v. Fell*, Civil No. ELH-13-3927, 2014 WL 4406849, at *7 (D. Md. Sept. 5, 2014) (stating that "it is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss"). Given that Plaintiff has not sufficiently alleged the violation of a legal duty or that her harm resulted from fright or shock, such details would not affect this claim's dismissal.

to the type of "fright or shock" identified in *Hughes*, and her failure to allege a "physical injury" resulting from such fright or shock. Accordingly, the Court will dismiss Count XXVIII.

### G. Declaratory Judgment: Count XXIX

Plaintiff alleges a claim for declaratory judgment against Liberty under Count XXIX. She seeks a declaration that "the findings and sanction against [Plaintiff] made by Liberty pursuant to the Remediation Process be reversed," among similar requests. Dkt. 4 at ¶ 589. But declaratory judgment is a remedy, not a cause of action. *Skelly Oil Co. v. Phillips Petroleum Co*., 339 U.S. 667, 671 (1950); *Healy v. Chesapeake Appalachia, LLC*, No. 1:10-cv-00023, 2011 WL 24261, at *16 (W.D. Va. Jan. 5, 2011). Declarative relief is appropriate "only when it will clarify and settle the legal relationship of the parties," *Penn-Am. Ins. Co. v. Coffey*, 368 F.3d 409, 412 (4th Cir. 2004), and where "the uncertain party [can] gain relief from the insecurity caused by a potential suit waiting in the wings," *United Capitol Ins. Co. v. Kapiloff*, 155 F.3d 488, 494 (4th Cir. 1998). *Doe v. Va. Polytechnic Inst. & State Univ.*, No. 7:19-cv-00249, 2020 WL 1309461, at *9 (W.D. Va. Mar. 19, 2020). Plaintiff requests relief for a past wrong, rather than "request[ing] clarification of [her] rights to avoid future litigation." *Id*. As such, declarative relief is inappropriate. Regardless, Plaintiff is not entitled to the relief she requests under Count XXIX, even if the Court were to liberally construe it as a request for injunctive relief, because her complaint fails to state a claim on which relief can be granted as all the counts have been dismissed.

### V. CONCLUSION

In accordance with the foregoing analysis, the Court will dismiss Counts I through XXIX of Plaintiff's complaint against all of the defendants to this action. It will deny Plaintiff's request for leave to file her surreply and grant Defendants' motion to strike Plaintiff's surreply from the record. As this action has been dismissed in its entirety, Plaintiff's motion for summary judgment,

Dkt. 17, Liberty's motion to stay Plaintiff's motion for summary judgment, Dkt. 25, and Plaintiff's motion to compel discovery responses and production, Dkt. 46, will be denied as moot.

An appropriate Order will issue, and the Clerk of the Court is hereby directed to send a copy of this Memorandum Opinion to Plaintiff and all counsel of record.

Entered this ___13th___ day of April, 2020.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE